539 P.2d 517

**Keith B. TAYLOR, Appellant,**

v.

**Walter MUELLER, dba Walters Transport, and Harvey L. Martz, Appellees.**

**No. I CA–CIV 2732.**

Court of Appeals of Arizona, Division 1, Department A.

June 17, 1975.

Rehearing Denied Dec. 18, 1975.
Review Denied Jan. 27, 1976.

---

Robert J. Spillman, Phoenix, for appellant.

Gust, Rosenfeld, Divelbess & Henderson, by James F. Henderson, Phoenix, for appellees.

## OPINION

WREN, Judge.

The appellant, Keith B. Taylor, brought a wrongful death action against the appellees, Walter Mueller, dba, Walters Transport, and Harvey L. Martz; and also against Eleanor M. Dixon, Administratrix of the Estate of Patrick F. Madland, deceased. From an order granting appellees' motion for summary judgment, appellant has filed this appeal, challenging the finding of the trial court that there was no

material issue of fact. We agree that the motion was properly granted.

The events and tragedy with which we are here concerned involved a collision of two motor vehicles at 1:00 a. m. on March 4, 1973, at the intersection of Bell Road and 59th Avenue in Maricopa County. At the time of the accident, Bruce Jeffrey Taylor, appellant's decedent, was riding as a passenger in a motor vehicle operated by Patrick F. Madland. Both Taylor and Madland were killed as a result of injuries received. The other vehicle was a truck owned by defendant Walters Transport, and being driven by its agent and/or employee, Harvey L. Martz.

Prior to the collision the vehicle operated by Madland was southbound on 59th Avenue, and the truck driven by Martz was traveling west on Bell Road. There was a posted stop sign for southbound traffic on 59th Avenue at its intersection with Bell Road; but there was no stop sign for vehicular travel on Bell Road, which was a protected thoroughfare.

Martz was the only surviving eyewitness. In describing the accident in his deposition, he stated that he did not know how far his truck was from the intersection, or how fast he was traveling when he first saw the southbound vehicle. He testified that as he approached 59th Avenue, he was still in a shifting process to attain a normal traveling speed of 55 miles per hour, having just made a stop to check his refrigeration unit. He further related that when he first observed the Madland vehicle he did not pay much attention to it, and that he did not continuously watch it. He stated that he had no idea how fast it was traveling or how far it was from the intersection; that it may have actually been as far back as one-half mile. He related that the headlights on the other vehicle were burning. Martz also testified that he was very familiar with the area in question and knew that there was a posted stop sign ahead of the Madland vehicle at the intersection.

As Madland neared Bell Road, Martz testified that he "let off on" the accelerator of the truck. He further testified that the other vehicle was barely moving when he saw its brake lights come on at a point about 50 feet back from the intersection; and that the brake lights stayed on substantially all the way to Bell Road. Martz estimated that at the time Madland's brake lights first came on, his truck was some 200 feet back from the intersection. He stated that the other vehicle was barely moving as it approached the stop sign, and that he believed it was going to stop.

After Madland had pulled up to the stop sign and stopped, or nearly stopped, having slowed to a speed of approximately one-half mile per hour, Martz applied the accelerator again. According to his deposition, he was still 150 to 200 feet back from the intersection at the time Madland's car reached the stop sign.

According to Martz when his truck was about 100 feet east of the intersection and traveling about 50 miles per hour, Madland's vehicle entered the intersection from the stop sign "just like a bullet"; that it accelerated "real fast"; and that he applied the brakes on his truck "real hard."

It is undisputed that there was no other traffic at or near the intersection at the time, and that the collision occurred in the westbound lane of traffic on Bell Road. Also, that on the evening in question visability was good and there were no obstructions.

The defendant Dixon, administratrix of the estate of Patrick F. Madland, admitted on the record that her decedent drove through the stop sign, and that a chemical analysis performed by the Maricopa County Medical Examiner reflected a blood alcohol level for Madland of .29 percent.

Initially we note that it is a well established precept that issues of negligence are generally not appropriate subjects for summary adjudication in negligence cases, and should be resolved by trial in the ordinary manner. *Boozer v. Arizona Country Club,* 102 Ariz. 544, 434 P.2d 630 (1967); *Wilson v. City of Tucson,* 8 Ariz.App. 398, 446 P.2d 504 (1968).

As was stated in *Elson Development Co. v. Arizona Savings & L. Ass'n,* 99 Ariz. 217, 220, 407 P.2d 930, 932 (1965), the trial court

"[d]oes not try issues of fact, but only determines whether the same are genuine and in good faith disputed. * * * A motion for summary judgment is granted erroneously if on an examination of the entire record it is found that any disputed fact issue exists which could, if true, affect the final judgment." (Citations omitted).

After noting the foregoing quotation from *Elson* the court in *Boozer, supra,* stated:

"[T]he principle extends much further. If the material facts, although not in dispute, are uncertain, a summary judgment is improper." 102 Ariz. at 548, 434 P.2d at 634 (Citations omitted).

■ Accordingly, this Court has studied with intensive care the deposition of Martz, together with the remainder of the record appropriate to the trial court's consideration of the motion for summary judgment, for all reasonable inferences of negligence on the part of Martz. In doing so, we have viewed the evidence, as we must, in a light most favorable to appellant, and have given him the benefit of all inferences reasonably to be drawn therefrom. *Faris v. Doctors Hospital, Inc.,* 18 Ariz. App. 264, 501 P.2d 440 (1972). Also we have kept in mind appellant's assertion that the facts of this intersection collision are too uncertain to support a summary judgment motion, and that there are inferences which would support a jury determination that Martz failed to have his vehicle under proper control, and that he failed to maintain a proper vigil.

Appellant is apparently voicing the argument that Mertz had a warning, or should have a warning, that Madland might not stop at the intersection, and hence his failure to control and slow down the truck in time to avoid a collision constituted possible negligence.

In support of his theory, appellant attempts to dispute appellees' assertion that Madland's brake lights came on about 50 feet back and stayed on *substantially all the way* to the intersection. He refers to the following portion of the Martz deposition as showing that such a conclusion cannot stand as uncontroverted fact:

"A. I'd say he was from the intersection when I seen his brake lights come on the first time maybe 50 feet or better, because he was just coasting into it.

"Q. What do you mean, the first time?

"A. When I seen his brakes come one. You asked when I first—

"Q. Did his brake lights come on more than once?

"A. No; they just come on and stayed on as he come up to a stop.

"Q. Are you positive that the brake lights stayed on constantly from 50 feet back from the intersection on that southbound vehicle?

"A. No, I'm not positive they come on constantly, no, but I mean we—your first thinking when you come up to a stop sign, I do, I put on my brake.

"Q. No; let's talk about what he did.

"A. Well, I mean what he did I don't remember. They might have blinked once or twice, you know."

■ It is our opinion that the only reasonable conclusion that can be derived from this evidence is that the Madland vehicle, as observed by Martz, was apparently braking to a stop, at a known stop sign, at a known intersection.

Appellant further challenges the argument asserted in appellees' brief that Madland *pulled up to the stop sign and stopped.* He points to the following record as reflecting inconsistent statements by Martz on this point:

"A. Well, like I said. I let up on the accelerator. I seen him pull up to the stop sign and stop and I went back to the accelerator again."

**408**

\*　\*　\*　\*　\*　\*

"Q. Did that other vehicle stop before it entered the intersection of Bell Road and 59th Avenue?

"A. I believe it stopped, yes.

"Q. You believe it did?

"A. Yes.

"Q. But you are not positive, are you?

"A. Well, you can't be positive, I don't think.

"Q. You are not positive, are you?

"A. I'm not positive, no."

■ Whether, as observed by Martz, the Madland vehicle actually stopped, or almost stopped, or was apparently going to stop, is completely immaterial to the issue of negligence on the part of Martz. Reasonable minds could not possibly differ that these sworn statements would permit *only* a determination that Madland failed to obey the law regarding the approach to and the use of the intersection,[1] and that Martz reasonably concluded that Madland was braking to a stop. We think that Martz' lack of certainty here is fully understandable and reasonable, raising no justiciable issue of fact.

■ Appellant also takes issue with Martz' claim that the Madland vehicle entered the intersection "just like a bullet" and that "it accelerated real fast, real fast, right out there." He points out that Martz subsequently stated on cross-examination that he did not know how fast the vehicle was going from the time it passed the stop sign to the collision, and that the question of speed therefore resolves itself into a jury issue.

"Q. Do you have any idea how fast that other vehicle was going at any point from the time that it passed the stop sign up to the time that you had the collision with it?

"A. No.

"Q. You can't estimate the speed for us? If you can't, you can't. I'm just asking.

"A. I mean—well, you know, when something takes off like a—from like a dead stop, pretty near, and jumps up there, you can't just measure speed in that short few feet."

\*　\*　\*　\*　\*　\*

"Q. Well, didn't you testify that you saw that vehicle shoot like a bullet into the intersection going southbound—

"A. I ain't sure—"

It is obvious from the record that the inconsistent statements related solely to Martz' uncertainty as to the *actual* speed with which the Madland vehicle entered the intersection and not to the fact that it entered *fast*.

■ We also disagree with appellant's assertion that a material dispute of fact arises because of Martz' disagreement with Exhibit 3 attached to his deposition. Exhibit 3 is a diagram of the accident scene prepared by the investigating police officer as a part of the accident report. It is made a part of this opinion as Appendix A. We feel that neither the Exhibit nor Martz' following statements in regard thereto abort the uncontroverted fact that the collision took place in the westbound lane of Bell Road, with the death vehicle directly in front of the truck at the time.

1. A.R.S. § 28–773, pertaining to vehicles entering through a highway or stop intersection provides as follows:

"A. The driver of a vehicle shall stop as required by § 28–855 at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from the through highway or which are approaching so closely on the through highway as to constitute an immediate hazard, but such driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on the through highway shall yield the right of way to the vehicle so proceeding into or across the through highway.

"B. The driver of a vehicle shall likewise stop in obedience to a stop sign as required by this chapter at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway, and shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed."

"Q. [By Mr. Spillman]: Mr. Martz, I'm handing you what has been marked as Plaintiff's Exhibit No. 3, and this is another portion of the officer's report which has been attached to and made a part of Mr. Henderson's motion for summary judgment.

"Would you examine that diagram and tell me whether or not in your opinion it accurately depicts the positions of the vehicles at the time of collision and the respective directions in which they were traveling.

"A. They are traveling in the right direction but I can't say that this guy was turning like that.

"Q. You disagree with the officer's—

"A. I mean I disagree with this here turning because I don't know for sure whether he was turning or not. I don't —it don't seem—it seems to me like he was right straight ahead of me, right straight in front of me, at the point of impact.

"Q. In other words, on Exhibit No. 3 it shows that No. 1 is in the process of making a left-turning movement.

"A. Yes.

"Q. And you don't agree with that?

"A. Well, I'm not sure of that, but it didn't seem like he was at the time.

"Q. And Exhibit No. 3 shows your vehicle traveling in a relatively straight westbound position, not only up to but through the point of collision, and you don't agree with that, do you?

"A. Because I was skidding a little sideways there.

"Q. You were actually turning toward the left, weren't you?

"A. Well, I had turned before I ever went into a skid—

"Q. Right.

"A. —because—before I ever—like I said, I give them a wide berth when I see somebody at a stop sign. I do that a lot of times. Sometimes their nose will stick out on the car. I knew this wasn't a car and didn't have a nose, but it's just an automatic thing I do.

"Q. Exhibit No. 3 isn't correct in showing your motion, is it?

"A. No; it isn't correct going afterward, either.

"Q. And it's not correct showing the movement of the vehicles afterwards, is it?

"A. No."

Appellant additionally challenges the affidavit of Martz, as containing conclusions of ultimate fact which could not appropriately be considered by the court in its determination of the propriety of summary judgment. Appellant cites *Elerick v. Rocklin*, 102 Ariz. 78, 425 P.2d 103 (1967), wherein the court notes:

"Rule 56(e) is explicit in requiring that 'Supporting and opposing affidavits shall be made *on personal knowledge,* shall set forth such *facts as would be admissible in evidence,* and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' * * * Obviously mere in conclusions of ultimate fact as are permitted in pleadings and conclusions of law do not meet this test." 102 Ariz. at 81, 425 P.2d at 106 (Emphasis added in *Elerick*).

We have examined the affidavit and find that it does not fall short of these standards. It clearly contains statements and opinions Martz was qualified to make from his own observations. *See Madsen v. Fisk,* 5 Ariz.App. 65, 423 P.2d 141 (1967); *Finn v. J. H. Rose Truck Lines,* 1 Ariz.App. 27, 398 P.2d 935 (1965).

Finally, appellant objects to appellees supporting their motion by the accident report, photographs of the scene, death certificates, and reports of chemical analysis of the blood alcohol level of the decedents, on the ground that such documents were not properly verified as required by Rule 56(e), Rules of Civil Procedure, 16 A.R.S.[2]

---

2. "Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."

■ Again we disagree. A diagram of the accident scene, identified as part of the accident report was, at the request of appellant, attached to and made a part of the deposition of Martz as Exhibit 3. It was used by appellant in his cross-examination of Martz and presumably, in his argument to the court. Any objections to Exhibit 3 have therefore been waived. *See Wakeham v. Omega Construction Co.*, 96 Ariz. 336, 395 P.2d 613 (1965); *Hoffer v. Wetzel*, 95 Ariz. 384, 390 P.2d 911 (1964). The remainder of the accident report is superfluous as a supporting record to the trial court's decision and the affirmance of this Court.

■ Nor do the photographs and death certificates add anything to the record. It is conceded that both Madland and Bruce Jeffrey Taylor died, and the photographs depict nothing not otherwise asserted and established. As to the medical report of the blood alcohol level, the defendant Dixon made an uncontroverted and sworn admission that the report indicated the blood alcohol level of the driver of the death vehicle to be .29 percent.[3] We find nothing misleading about these exhibits, and appellant points this Court to no such deceiving aspect.

■ It is thus readily apparent that the documents to which appellant objects, even if improperly before the court, were wholly unnecessary to the trial court's decision. Moreover, the court will be presumed to have ignored such improper evidence, and its judgment will be affirmed if there is sufficient proper evidence to sustain it. *Murphy v. Yeast*, 59 Ariz. 281, 126 P.2d 313 (1942); *State Tax Comm'n v. Marcus J. Lawrence Mem. Hosp.*, 14 Ariz.App. 554, 485 P.2d 277 (1971), *va-cated on other grounds*, 108 Ariz. 198, 495 P.2d 129 (1972).

■ The supporting affidavits to the motion for summary judgment, the deposition of Martz, the responses to requests for admissions of fact, and the answers to interrogatories clearly establish that the motion was not improvidently granted. Under no theory of negligence law does the evidence indicate Madland's compliance with A.R.S. § 28–773, or permit consideration of the "last clear chance doctrine" by the trier of fact. The principle enunciated in *Nichols v. City of Phoenix*, 68 Ariz. 124, 202 P.2d 201 (1949), that the favored driver must yield "to a motorist when . . . [he] discovers that the motorist is not going to yield the right-of-way," cannot find sanctuary in the evidence presented to the trial court here.

■ In fact we find no evidence in support of any theory other than that Martz fully, lawfully and properly controlled his vehicle in approaching the intersection prior to the accident. The uncontroverted fact that Madland drove his vehicle directly into the path of Martz' truck, which was then 100 feet away, traveling 50 to 55 miles per hour with headlights ablaze, and that Martz immediately applied his brakes to avoid a collision, would not permit any other conclusion. The record is clear that he had every reason to believe that Madland was stopping or had stopped in obedience to the stop sign. There is nothing by which a trial court could permit a jury to consider that Martz knew or in the course of due care should have known that Madland was not going to stop or had not in fact yielded the right-of-way.

The judgment is affirmed.

OGG, P. J., and FROEB, J., concur.

---

3. A.R.S. § 28–692 (Supp.1973) provides in part:

"B. In the trial of any civil . . . action or proceeding . . . relating to driving or being in actual physical control of a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defendant's blood at the time alleged as shown by chemical analysis of the defendant's blood, urine, breath or other bodily substance shall give rise to the following presumptions:

\* \* \* \* \*

"3. If there was at the time 0.10 percent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor."

## APPENDIX A

▮▮▮▮▮▮▮▮
▮▮▮▮▮

**ARIZONA TRAFFIC ACCIDENT REPORT**

PREPARE COPY TO:  TRAFFIC SAFETY DIVISION
P.O. Box 13588, Phoenix, Ariz 85002

**SUPPLEMENT**

| | DATE | | | | Hour | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Month | | Day | | | | | |
| 7 | 3 | 0 | 3 | 0 | 4 | 0 | 0 | 5 | 2 |

REPORT ID

| NCIC NO | | | | Officer's ID No. | | | Day of Week |
|---|---|---|---|---|---|---|---|
| 0 | 7 | 0 | 0 | 0 | 0 | 2 | 7 | 0 | 1 |

AGENCY USE

73-06235

**ACCIDENT DIAGRAM**

☐ Measurements are approximate and not to scale.
■ Measurements are scaled (Scale = 1"=20' )

Indicate North By Arrow

P.I.
12 S/N Bell
16 W/E 59th Ave

◁ 2 ◁ 2 — Bell Road —

SHOULDER

IRRIGATION DITCH

59th Ave

— P.R.
Vehicle I
Bell S/S 25½ R/R
Bell S/S 35½ R/F
59th Ave w/w 169 R/R
59th Ave w/w 171 R.F.

P.I.- P.D.
1922

No SKID Vehicle I

— P.R.
Vehicle II
Bell N/S 2½ R/R
Bell N/S 33½ R/F
59th Ave w/w 129½ R/R
59th Ave w/w 167 R/F

P.I.- P.D.
1922

SKID Vehicle II
TO
P.I.
LEFT 107½
Right 20½

AFTER P.I.
LEFT 144½
Right 155½

AHD 1-641-1 10/72

Rep. 3 Ident
10-19-73
DWK